UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


LAURA LINDSAY BRAWNER,

       Plaintiff,

                                   Case No. 3:16-cv-00130
   vs.                          JUDGE ALETA A. TRAUGER
                                   Magistrate Judge King

SOCIAL SECURITY ADMINISTRATION,

       Defendant.


To:  The Honorable Aleta A. Trauger, District Judge

REPORT AND RECOMMENDATION

      This is an action instituted under the provisions of 42 U.S.C. §§ 405(g), 1383 for review of a final decision of the Commissioner of Social Security denying Plaintiff's applications for disability insurance benefits and supplemental security income. This matter is before the Court on Plaintiff's Motion for Judgment on the Administrative Record (Doc. No. 9)("Motion for Judgment") and Memorandum in Support (Doc. No. 10), Defendant's Response to Plaintiff's Motion for Judgment on the Administrative Record (Doc. No. 11)("Response"), and the administrative record (Doc. No. 5).[1] For the following reasons, the undersigned **RECOMMENDS** that the Motion for Judgment be **DENIED**, that the decision of the Commissioner be **AFFIRMED**, and that final judgment be entered in favor of the Commissioner pursuant to Sentence 4 of 42 U.S.C. § 405(g).

---

[1] Citations to pages in the Administrative Record will appear as "Tr. __."

1

**Introduction**

Plaintiff filed her current applications for benefits in January 2012, alleging that she has been disabled since December 29, 2009, by reason of both physical and mental impairments. *See* Tr. 334. The applications were denied initially and on reconsideration and Plaintiff requested a *de novo* hearing before an administrative law judge ("ALJ").

A number of administrative hearings were held. On September 18, 2013, the ALJ continued the hearing to permit Plaintiff to obtain counsel. Tr. 126-31. At a supplemental hearing held on January 24, 2014, Plaintiff, appearing with counsel, testified, as did vocational expert Chelsea Brown. Tr. 83-124. A second supplemental hearing was held on June 27, 2014, following a consultative medical examination of Plaintiff. Plaintiff, who was represented by counsel, testified at that hearing, as did Rebecca Williams, who testified as a vocational expert. Tr. 49-63.

In a decision dated August 16, 2014, the ALJ held that Plaintiff was not disabled within the meaning of the Social Security Act from her alleged date of onset through the date of the administrative decision. That decision became the final decision of the Commissioner of Social Security when the Appeals Council declined review on December 15, 2015.

This action was thereafter timely filed. This Court has jurisdiction over the matter. 42 U.S.C. § 405(g).

**The Findings and Conclusions of the ALJ**

In his decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2015.

2.   The claimant has not engaged in substantial gainful activity since December 29, 2009, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.*).

3.   The claimant has the following medically determinable impairments: obesity, degenerative disc disease of the lumbar and cervical spine, L4-5 spondylosis and mild stenosis, arthritis, postural disc protrusion with annular tear at C5-6 with moderate stenosis, mild C6 radiculopathy, sciatica, fibromyalgia, polycystic ovary syndrome, mild carpal tunnel syndrome, left ulnar entrapment, bipolar disorder, personality disorder, mood disorder, panic disorder with agoraphobia, and history of alcohol abuse (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except the claimant can occasionally lift and/or carry twenty pounds, and frequently lift and/or carry ten pounds. During an eight-hour workday, the claimant can sit for eight hours.   The claimant can stand and/or walk for at least two hours, with normal breaks, in an eight-hour workday.   The claimant can occasionally push and/or pull objects with her lower extremities.   She can frequently use her bilateral upper extremities for handling and fingering.   The claimant can occasionally reach overhead with her left upper extremity.   The claimant can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. The claimant can occasionally balance, stoop, kneel, crouch, and crawl. The claimant should avoid concentrated exposure to extreme temperatures, and workplace hazards such as moving machinery and unprotected heights. The claimant can understand, remember, and carry out detailed tasks and instructions.

6.   The claimant is capable of performing past relevant work as a Benefits Clerk and Receptionist. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from December 29, 2009, through the date of this decision (20 CFR 404.1520(1) and 416.920(1)).

(Tr. 22-23, 25, 39-40).

## Plaintiff's Claims

Plaintiff asserts the following claims:

1. The ALJ improperly assigned less weight to the treating physician's opinion of limitations.

2. The ALJ failed to properly perform decisional duties at Step Three of the Sequential Evaluation.

Memorandum in Support (Doc. No. 10, PageID# 889-892). Plaintiff does not challenge the ALJ's credibility determination, nor does she challenge the vocational evidence.

## Standard of Review

Pursuant to 42 U.S.C. §405(g), judicial review of the Commissioner's decision is limited to determining whether the findings of the ALJ are supported by substantial evidence and employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389 (1971); *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)(internal quotation marks and citation omitted). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003). This Court does not try the case *de novo*, nor does it resolve conflicts in the evidence or questions of credibility. *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).

In determining the existence of substantial evidence, this Court must examine the administrative record as a whole. *Kirk v. Sec'y of Health and Human Services*, 667 F.2d 524, 536 (6th Cir. 1982). If the

Commissioner's decision is supported by substantial evidence, it must be affirmed even if this Court would decide the matter differently, *Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028 (6th Cir. 1990)(citing *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983)), and even if substantial evidence also supports the opposite conclusion. *Longworth v. Commissioner Social Security Administration,* 402 F.3d 591, 595 (6th Cir. 2005)(citing *Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004)).

## Summary of Relevant Evidence

The medical record in this case is voluminous and reflects extensive treatment for a number of conditions over a number of years. Based on that record, the ALJ found that Plaintiff suffers a number of severe impairments. However, it is only Plaintiff's severe back impairments that are relevant to the issues presented in this case. The ALJ accurately summarized the medical record in that regard as follows:

Medical records documented long-standing history of spine difficulties resulting from a car accident on August 24, 2004. The evidence shows the claimant received consistent medical care from Dr. James Elrod beginning in 2001. He treated the claimant for back pain, depression, anxiety, and obesity. (l0F). Imaging performed on that date revealed disc space narrowing at C5-C6, with anterior and posterior osteophytes. (lF). Records from Dr. Michael Moore, dated September 8, 2004, indicated the claimant's history of cervical pain actually dated from 1997. (2F). X-ray of the lumbar spine, dated July 9, 2004, showed disc space narrowing at L4-L5, and L5-Sl, but not spondylosis. (l0F). Magnetic resonance imaging (MRI) of the lumbar spine, performed on September 15, 2004, revealed disc protrusion at L4-L5, paracentral to the right, into the neural foramina narrowing the foramen. (3F, 30F). MRI of the cervical spine performed on the same date, showed significant disc protrusion at C5-C6 and C6-C7, particularly at C6-C7, with posterior displacement of the cord and loss of subarachnoid space. The disc protrusion was noted as mild in nature. (3F, 30F).

In records from September 20, 2004, Dr. Gary Stahlman wrote he believed the claimant had cervical and lumbar strain, with underlying aggravation of degenerative disc changes at C5-C6, C6-C7, and L4-L5. He wrote the claimant did not have an acute disc herniation, and opined she evidenced some symptom magnification. (30F). The claimant underwent physical therapy to treat her symptoms. In Dr. Stahlman's treatment notes from October 27, 2004, he wrote, "Ms. Brawner returns stating that the physical therapy has helped her back pain quite a bit." Dr. Stahlman recommended continuing her physical therapy program and emphasized the importance of a home-based program. (28F, 30F). On December 22, 2004, Dr. Stahlman noted the claimant stated back pain was no longer a problem. She reported continued neck pain, spasm, and pain across her shoulders that periodically radiated down her arms. On exam, the claimant was neurologically intact, and she had good range of motion of her neck, but with pain. Dr. Stahlman found the claimant had no permanent restrictions. (30F).

On October 1, 2007, nerve study and electromyography (EMG) in the upper extremities showed possible borderline radiculopathy involving the C5-C6 roots. (4F, 7F). The claimant presented on June 26, 2009 to Dr. Garrison Strickland with complaints of back and neck pain, and pain and weakness in her left upper extremity. EMG and nerve conduction studies performed on that date revealed minimal left median nerve entrapment at the wrist consistent with left carpal tunnel syndrome, but no evidence of right median nerve entrapment. No evidence was seen of generalized peripheral neuropathy, left cervical radiculopathy, or left lumbar radiculopathy. . . . (19F). At follow-up on August 6, 2009, Dr. Strickland wrote the claimant's left arm pain was markedly improved, and all symptoms, other than lower back pain, were resolved. Dr. Strickland noted MRI preformed on July 9, 2009, of the cervical and lumbar spine showed spondylosis. (6F). The claimant underwent a course of physical therapy for ankle and foot pain. Dr. Strickland 's progress notes from September 17, 2009, indicated marked improvement as the result of therapy. (8F, 10F, 19F).

***

Dr. Strickland's records from December 7, 2009, noted the absence of back pain, joint pain, joint redness, joint swelling, muscle pain, muscle weakness, or neck pain. (30F). During a visit on October 5, 2010, Dr. Elrod noted the claimant felt well, with minor complaints, had good energy, but was sleeping poorly. He wrote the claimant exercised three to four times a week. Dr. Elrod noted no physical or mental abnormalities upon his examination of the claimant. (10F).

***

The claimant received treatment from Nashville Medical Group. On January 19, 2012, the claimant's medical problems included trapezius muscle spasm, somatic dysfunction of cervical and thoracic region, and polycystic ovarian syndrome. Records noted the claimant complained of pain in the neck and left shoulder, radiating to the left hand. It was noted the claimant previously took Tramadol for pain, but was not currently taking pain medication. Physical examination noted neck and shoulder discomfort and stiffness. However, exam found no reduction in range of motion or strength in any areas. . . . The claimant was prescribed Flexeril and Hydrocodone to treat symptoms. On February 7, 2012, records noted, "As patient symptoms do not correlate with physical findings suspect patient may affect her pain. Will try to treat with Amitriptyline which will help depression symptoms and chronic pain." Nashville Medical Group records from February 13, 2012, documented an assessment of lower back pain, for which evaluation and treatment by pain management was ordered. (19F).

On February 29, 2012, the claimant presented to the Center for Spine, Joint, and Neuromuscular Rehabilitation for an initial consultation. The claimant reported prescribed Flexeril and Norco helped lessen her pain, but not relieve it entirely. She stated she had undergone physical therapy on several occasions, but denied effectiveness in decreasing her symptoms. The claimant's prescribed Neurontin and Lortab were increased in dosage level. An assessment was provided of chronic pain syndrome. She was instructed to increase stretching exercises and activity as tolerated. The claimant returned on March 28, 2012, with similar complaints, but reported prescribed pain medication helped lessen her pain and allowed her to be active with her children. She denied side effects from the medication. Mild cervical lymphadenopathy palpable was noted upon physical examination. There was moderate palpable tenderness to the cervical spinous processes, and mild to moderate pain with palpation of the cervical paraspinals and bilateral trapezius muscles with noted spasm. Right upper extremity range of motion and abduction was without pain or limitations, left shoulder range of motion was full, but revealed pain and crepitations palpable. Straight leg raise test was positive bilaterally, with mild palpable tenderness to the sacroiliac joints. Gait was mildly antalgic without a limp, limitations, or assistive devices. Impression included cervicalgia, cervical radiculopathy, spondylosis, and spinal stenosis, lumbago, degenerative disc disease of the lumbar spine, lumbar spondylosis with radiculopathy, and bilateral leg pain. Current medication was continued, with possible future treatment including a transcutaneous electrical nerve

stimulation (TENS) unit, a back brace, physical therapy, and possibly interventional injections. (20F, 37F).

Treatment notes from February 25, 2013, documented the claimant presented with complaints of pain, anxiety, and depression. Records noted the claimant reported she was involved in a motor vehicle accident in 2004, went to physical therapy and got better. However, she now alleged progressively worsening pain. Exam revealed diffuse tenderness to palpation over paraspinal musculature. The claimant stood-up halfway through appointment due to being uncomfortable sitting the whole time. Straight leg raise was negative bilaterally. An assessment was given of back pain and depression. Records from Calvin Johnson, M.D., dated March 13, 2013, noted the claimant was seen for neck and back pain. It was noted the claimant was not currently on any medication. Dr. Johnson wrote that the exam revealed that she did not appear to be in any obvious pain. Her gait was normal, range of motion of the neck showed some limitation of flexion with pain experienced posteriorly. The claimant was "a little sensitive over the paracervical muscles." The neurologic examination of the upper extremities was normal, muscle power is intact. There was a little sensory deficit. The low back revealed some discomfort in the lumbar area with both flexion and extension. Hip motion on the left side was not decreased, but was painful. Straight leg raising tests were normal. Dr. Johnson wrote the MRI of the cervical spine showed disc protrusion at C5-6 and C6-7 posteriorly and mild at C4-5. Lumbar spine MRI showed some degenerative change at L4-L5. He provided an assessment of cervical degenerative disc disease and lumbar degenerative disc disease. He opined the claimant had chronic pain syndrome with respect to her back and neck. He further opined this condition would be best treated with a continued exercise program. He noted there was no sign of any neurologic deficit. Dr. Johnson indicated he had a long discussion about weight loss and continuing the exercise program. He noted that, "at the present time, she does not think she wants to come to the physical therapy here for a review of the exercise." (30F).

The claimant presented to Faith Family Medical Clinic on April 10, 2013, with complaints of continued neck and back pain. Records noted that previous MRIs of cervical and lumbar spine showed stenosis and some disc bulges, but no impingement of specific nerves. The claimant reported her left upper extremity is "fried", a previous diagnosis of carpal tunnel through EMG testing, and continued numbness and tingling. The claimant specifically denied attending physical therapy, stating that she did not believed it works. The claimant admitted she is not responsible enough to continue physical therapy at home after discharged from a formal physical therapy program. She then reported symptoms return after she stops doing exercises. It

was explained to the claimant that the ineffectiveness of physical therapy was not a problem with the actual therapy itself, but rather compliance. Upon examination, the claimant had a normal gait and was able to stand without difficulty. The claimant was prescribed Cymbalta and MRIs of the cervical and lumbar spine were ordered. (30F).

Magnetic resonance imaging (MRI) of the cervical spine performed at Premier Radiology Charlotte Pike on April 22, 2013, revealed degenerative changes of the cervical spine, most severe at C5-C6 and C6-C7. There was posterior disc protrusion with annular tear at C5-C6, resulting in moderate ventral canal stenosis with effacement of the lateral recess bilaterally. There was moderate left foraminal narrowing at this level. MRI of the lumbar spine showed mild left neuroforaminal stenosis at L3-L4, mild central canal stenosis, and mild bilateral neuroforaminal stenosis at L4-L5. (29F).

Treatment notes from Gary Stahlman, M.D., indicated he initially saw the claimant after her 2004 motor vehicle accident, when she reported neck pain and lumbar pain. He noted these conditions were generally managed with therapy and medications. Dr. Stahlman wrote at that time she was noted to have fairly substantial disc space degenerative changes at L4-5 as well as in her cervical spine. He noted the claimant complained of continued problems with both neck pain and lower back pain. He noted more recent symptoms as several years of radicular pain complaints, including pain paresthesias predominantly in the lateral aspect of her left shoulder brachium down into her forearm, as well as into her neck. The claimant also reported periodic episodes of pain and paresthesia around the periauricular area on the left into her forehead. She has pain across her shoulders and shoulder blades, and lower back discomfort radiates into the left leg predominantly in the posterolateral dermatome. Physical examination showed the claimant was neurologically intact in her bilateral upper and lower extremities. Dr. Stahlman wrote the MRI findings from April 22, 2013, were essentially similar to those seen on the MRI dated July 7, 2009. He provided an impression of progressively symptomatic cervical spondylosis and radiculopathy, as well as progressively symptomatic lumbar spondylosis, disc space degenerative changes, and stenosis. He discussed options of observation, trial of Gabapentin, epidural injection, or surgical discectomy and fusion. The claimant expressed a desire to try the Gabapentin. If her symptoms are not abated and she has no side effects, then dosage level would be increased at the next appointment. When the claimant returned on June 18, 2013, she alleged continued pain, but Dr. Stahlman wrote the claimant had not been taking the Gabapentin on a routine basis as prescribed. He recommended compliance with prescribed therapy. On July 10, 2013, the claimant returned and

stated she was feeling somewhat better overall. She reported continued burning discomfort into her legs, particularly when she standing and walking. . . . Dr. Stahlman wrote the claimant continued to take Gabapentin with good benefit overall. He reviewed diagnostic studies again, and noted that while the claimant did have some stenosis at L4-5, and surgical treatment may be able to provide her with some improvement in her leg symptoms, he was, "less hopeful that any type of surgery could help her neck issues given the diffuse spondylosis." The claimant agreed with Dr. Stahlman's advice. He agreed to see the claimant on an as-needed basis. (31F, 32F).

On May 1, 2013, the claimant presented with complaints of left arm and leg pain, and asked about a physical exam for fibromyalgia. Exam noted the claimant was tender in ten of eighteen spots for fibromyalgia. Records from June 26, 2013, documented the claimant called and stated Dr. Stahlman advised her to be referred to a pain management clinic. Dr. Panovec's records from September 3, 2013, noted the claimant was not doing physical therapy or exercises for her lower back pain. Dr. Panovec discussed water-based exercise at her local YMCA for back pain. After he reviewed her MRI results, he found the claimant's chronic back pain would most likely respond to long-term approach of gentle exercise, weight loss, and lifestyle modification. On September 26, 2013, Dr. Panovec wrote he spent forty-five minutes with the claimant filling out attorney's paperwork. He encouraged the claimant to continue with possible lifestyle changes. The claimant presented to Faith Family Medical Clinic on October 31, 2013, with complaints of increased anxiety and headaches. She reported stress related to her four-year-old son. She was assessed with general headache and stress. The treating provider informed the claimant that many of her symptoms would decrease if she could decrease her stress, and recommended seeing a counselor soon. September 30, 2013, noted the claimant was requesting a possible increase in Cymbalta. Records noted anxiety was not addressed, because the claimant was there for disability paperwork. (34F).

The claimant returned to the Center for Spine, Joint, and Neuromuscular Rehabilitation on January 28, 2014. Records noted the claimant stated she stopped treatment in 2012 due to losing insurance coverage. The claimant alleged constant pain in her back, neck, and legs. She reported sitting, standing, walking, lying down, driving, and numerous other activities increased her pain level. The claimant was instructed to engage in regular exercise, and was specifically advised against bed rest. . . . The claimant was prescribed Lortab, Flexeril, and Neurontin. Trigger point injections were scheduled, and physical therapy was considered. On February 25, 2014, the claimant received trigger point injections, and dosage levels of Norco and Neurontin were increased. An electro-diagnostic

study was ordered, as was a behavioral health consultation. On March 26, 2014, the claimant reported she received "50% relief for two weeks from the trigger point injections." Fioricet was added to the claimant's prescriptions, and she was advised to lose weight in order to help her back and joint pain. On April 23, 2014, the claimant stated she did not have her prescriptions filled, as she could not afford them. Electro-diagnostic performed on April 23, 2014, . . . revealed evidence of mild chronic C6 radiculopathy on the left, but no evidence of any other abnormalities, including lumbar radiculopathy in the left lower extremity. Records noted the claimant demonstrated clinical signs of radiculopathy and diagnostic testing was suggestive of nerve root impingement. Therefore, a therapeutic epidural steroid injection was recommended. . . .(37F).

The claimant presented to Dr. Timothy Mangrum for physical examination on May 29, 2014. . . . Physical examination revealed no tenderness in the spine or SI joints. Straight leg raise test was normal. Other than a decrease in range of motion on the left side, no abnormalities were noted in the extremities. Dr. Mangrum provided an assessment of polycystic ovarian syndrome, fibromyalgia, chronic pain, cervicalgia, pain in joint, malaise, fatigue, and obesity. The claimant was prescribed medication to treat symptoms and instructed to schedule a follow-up appointment in three months. (38F).

Regarding opinion evidence, Dr. Eric Swanson performed a consultative examination of the claimant and submitted a medical source statement on March 19, 2012. (11F). Dr. Swanson wrote the claimant indicated she began experiencing back and sciatic pain in 1997, and arthritis in August of 2006. The claimant also alleged dizziness, fibromyalgia, heart murmur, holocystic ovarian syndrome, and shoulder pain. Dr. Swanson observed the claimant appeared to be in no distress, and exhibited normal gait and station. He noted the claimant could walk on heels and toes without difficulty, and could not squat down fully. Dr. Swanson wrote the claimant did not use an assistive device, needed no help getting on and off the exam table, and was able to rise from chair without difficulty. Mobility was listed as normal. The claimant's grip strength measured as eighty pounds in each hand, and she was able to lift ten pounds with each hand. . . . The claimant's back was symmetric, with no spinal tenderness, spasms, or bony abnormalities palpated. Her extremities exhibited no cyanosis, clubbing, or edema. The claimant's Swansonmeasured as 5/5 in all major muscle groups. There was a full range-of-motion universally. There was no other tenderness, redness, swelling, spasm, joint enlargement, or muscle wasting in any joint examined. There was a negative Romberg Test, negative Straight Leg Raising Tests, bilaterally, and no other focal motor or

sensory deficits noted. Dr. Swanson gave an impression of Polycystic Ovarian Syndrome, with good prognosis. Fibromyalgia, per the claimant, prognosis also good. Shoulder pain, with full range of motion and good muscle strength. Episodic dizziness, with no abnormal physical findings, which could be orthostatic in nature. Arthritis, with full range of motion and good muscle strength. . . . Based on his examination of the claimant, Dr. Swanson opined the claimant had no impairment-related physical limitations. (11F). The undersigned accords some weight to the medical findings of Dr. Swanson, but finds the medical evidence of record indicates the claimant does have limitations related to her physical impairments.

Max Miller, M.D, reviewed the medical records for the State agency and completed a medical evaluation and physical residual functional capacity assessment in June of 2012. (13F, 4F). Dr. Miller opined the claimant could occasionally lift and/or carry up to twenty pounds and frequently lift and/or carry up to ten pounds. He found she could sit for about six hours in an eight-hour workday. Dr. Miller opined the claimant could stand and/or walk for up to two hours, with normal breaks, in an eight-hour workday. He found the claimant was limited in her ability to push and/or pull objects in her lower extremities. The claimant could occasionally reach overhead with her bilateral upper extremities. He found the claimant could occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. Dr. Miller opined the claimant could occasionally balance, stoop, kneel, crouch, and crawl. He opined the claimant should avoid concentrated exposure to extreme cold, wetness, and workplace hazards such as moving machinery and unprotected heights. 13F, 14F). Dr. Miller's opinions are consistent with the claimant's treatment history and other evidence of record, therefore, they are given significant weight.

Mark Cohn, M.D, completed a medical evaluation and case analysis on September 21, 2011. Dr. Cohn reviewed the prior assessment by Dr. Miller on July 22, 2011, and affirmed Dr. Miller 's initial assessment. (18F).

On March 29, 2012, Darshana Patel, M.D., performed a consultative examination of the claimant. (21F). On evaluation of range of motion Dr. Patel noted cervical spine flexion was 40 degrees, extension 60 degrees, right lateral flexion 40 degrees, and left lateral flexion 40 degrees. Right rotation was 70 degrees, and left rotation 70 degrees. In the dorsolumbar spine, flexion was 80 degrees, but otherwise extension and right and left lateral flexion were normal. In the claimant's shoulders, range of motion was normal bilaterally, with the exception of external rotation on the left shoulder, which was

80 degrees. Elbow and hip ranges of motion were normal. Knee range of motion was 100 degrees bilaterally. Wrist and ankle ranges of motion were normal, as were the hands and fingers. Muscle strength was 5/5 in the upper and lower extremities, including handgrip bilaterally. There were no focal motor or sensory deficits. Regarding gait and station, the claimant was able to briefly stand on one leg. She was able to squat and arise, and was able to walk heel-to-toe. Dr. Patel noted no abnormalities in the claimant's gait. Dr. Patel provided diagnoses of fibromyalgia, multiple joint complaints involving her upper body, depression, anxiety, degenerative disc disease, and polycystic ovary syndrome. In her summary, Dr. Patel found that based on her evaluation, the claimant did have some mild deficits in range of motion in her cervical spine, left shoulder, and knees, but no significant deficits were found. Muscle strength was normal in upper and lower extremities. Dr. Patel noted the claimant did appear to be in pain with many of the movements that she was asked to perform, but was able to move her joints without pain. Dr. Patel wrote the claimant also described a significant amount of depression, but this would be better evaluated with a psychological evaluation. Dr. Patel wrote she did not recommend that the claimant do any bending, squatting, crawling, climbing, or prolonged walking, but may be able to perform work in a sedentary setting. (21F). The undersigned gives some weight to Dr. Patel's opinions, but finds the medical evidence of record indicates the claimant has a greater ability to perform physical activities.

Marcus Whitman, M.D, reviewed the medical records for the State agency and completed a physical residual functional capacity assessment on April 26, 2012. (25F). Dr. Whitman opined the claimant could occasionally lift and/or carry up to twenty pounds and frequently lift and/or carry up to ten pounds. He found she could sit for about six hours in an eight-hour workday. Dr. Whitman opined the claimant could stand and/or walk for up to six hours, with normal breaks, in an eight-hour workday. He assigned no additional limitations in the claimant's her ability to push and/or pull objects. He found the claimant could occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. Dr. Whitman opined the claimant could occasionally balance, stoop, kneel, crouch, and crawl. He opined the claimant should avoid concentrated exposure to extreme cold, wetness, and humidity. He recommended the claimant should avoid all exposure to workplace hazards such as moving machinery and unprotected heights. (25F).

Dr. Whitman's opinions are generally consistent with the claimant's treatment history and other evidence of record, therefore, they are given some weight. However, the medical

opinions of Dr. Miller are more consistent with the medical records, and are given greater weight.

Celia Gulbenk, M.D., also reviewed the medical records for the State agency and completed a physical residual functional capacity assessment on June 20, 2012. (27F). Dr. Gulbenk opined the claimant could occasionally lift and/or carry up to fifty pounds and frequently lift and/or carry up to twenty-five pounds. She found the claimant could sit for about six hours in an eight- hour workday. Dr. Gulbenk opined the claimant could stand and/or walk for up to six hours, with normal breaks, in an eight-hour workday. Dr. Gulbenk found the claimant could frequently use her upper extremities to handle, finger, and push and/or pull objects, frequently climb ramps and stairs, and occasionally climb ladders, ropes, or scaffolds. Dr. Gulbenk opined the claimant could frequently balance, stoop, kneel, crouch, and crawl. She did not recommend any additional limitations. (27F). The undersigned finds Dr. Gulbenk's opinions are overly optimistic in light of the medical record, and gives them little weight.

On September 26, 2013, Dr. Panovec of Faith Family Clinic completed a treating source statement regarding physical capacities. Dr. Panovec opined the claimant could rarely lift and/or carry up to nineteen pounds, occasionally lift up to nine pounds, and frequently lift and/or carry less than four pounds. He found she could sit for up to three hours, for one hour at a time, in an eight-hour workday. Dr. Panovec opined the claimant could stand and/or walk for up to three hours, for one hour at a time, in an eight-hour workday. Dr. Panovec assigned limitations to the claimant's ability to grasp with her left hand, and push and/or pull objects with her bilateral upper extremities. He wrote the claimant was unable to use her left leg for operating foot controls. He found the claimant could frequently reach above her shoulder, and only rarely bend, squat, crawl, and climb. Dr. Panovec opined the claimant could have mild exposure to driving automotive equipment, and moderate exposure workplace hazards such as moving machinery and unprotected heights. (33F). The undersigned finds Dr. Panovec's opinions are overly restrictive and not consistent with the claimant's treatment history or the objective evidence of record. Dr. Panovec's recommended restrictions are given little weight, as the suggested severity of restriction is not supported by the medical evidence of record.

***

Subsequent to the January 24, 2014, hearing the claimant underwent a consultative examination by Dr. Horace Watson. (36F). Dr. Watson examined the claimant on April 15, 2014. Dr.

Watson wrote that upon physical examination, the claimant was considerably overweight, measuring five feet and nine inches in height, and weighing 278 pounds. Dr. Watson noted the claimant had a normal spinal curvature and a full range of motion of the cervical and thoracic spine. He wrote the claimant has limited motion of the lumbar spine with 30 degrees flexion, 20 degrees extension, and 20 degrees lateral bend to each side. The claimant had a full range of motion of all joints of the four extremities, and was 5/5 in motor function in all four extremities. She had excellent grip strength in both hands. The sciatic stretch test was negative bilaterally. The deep tendon reflexes are 2 plus, and equal in the upper and lower extremities. (36F).

Dr. Watson opined the claimant could occasionally lift and/or carry up to ten pounds. He found the claimant could sit, for up to two hours at a time, for up to six hours in an eight-hour workday. The claimant could stand for a total of two hours, for one hour at a time, in an eight-hour workday. The claimant could walk for a total of two hours, for one hour at a time, in an eight- hour workday. Dr. Watson found the claimant could occasionally use her upper extremities to reach, reach overhead, handle, finger, push, and pull. He opined the claimant could occasionally use her bilateral lower extremities to operate foot controls. He opined the claimant could occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. Dr. Watson opined the claimant could occasionally balance, stoop, kneel, crouch, and crawl. He wrote the claimant was unable to walk on rough or uneven surfaces for a block at a reasonable pace. He recommended could occasionally have exposure to operation of a motor vehicle, humidity, wetness, extreme temperatures, vibrations, and pulmonary irritants such as fumes, odors, gases, and poor ventilation. He recommended that the claimant should avoid all exposure to workplace hazards such as moving machinery and unprotected heights. (36F).The undersigned give little weight to Dr. Watson's recommended limitations. His suggested restrictions are not supported by his own examination or the objective medical record.

Tr. 26-34.

## Discussion

1. Opinions of Treating Physicians

Plaintiff complains that the ALJ failed to properly evaluate the opinion of Parker Panovec, M.D., a physician with the Faith Family

Medical Clinic whom Plaintiff characterizes as a treating physician. Dr. Panovec treated Plaintiff on September 3, 2013, for complaints of urinary symptoms. Tr. 775-76. Plaintiff also reported "back pain." Tr. 775. On clinical examination, Dr. Panovec noted "strength 5/5 lower ext[remities,] [deep tendon reflexes] 2+ [symmetrical,] [normal] gait." Tr. 776. Dr. Panovec reviewed the results of an MRI and characterized Plaintiff's back condition "most likely to respond to [a] long term approach of gentle exercise, weight loss, and lifestyle modification." *Id.* On September 26, 2013, Dr. Panovec spent 45 minutes with Plaintiff "filling out attorney's paperwork." Tr. 772. According to Dr. Panovec, Plaintiff could sit, and stand or walk, for less than three (3) hours in an 8-hour workday, for no more than one (1) hour at a time; could use neither hand for repetitive pushing and pulling; could not use her left foot and leg for repetitive movements; could frequently lift up to 4 pound, but only occasionally lift up to 9 pounds; could frequently carry up to 9 pounds, but only rarely carry 10 pounds; could only rarely bend, squat, crawl, and climb (although she could frequently reach above shoulder level); and would be moderately restricted in her ability to work around unprotected heights and moving machinery. Tr. 770-71. Dr. Panovec encouraged Plaintiff "to continue with possible lifestyle changes." Tr. 772.

The ALJ gave "no weight" to Dr. Panovec's exertional limitations, Tr. 38, finding that those limitations "are not supported by the underlying clinical testing." Tr. 37. The ALJ also noted, negatively, that Dr. Panovec's residual functional capacity assessment appears on a check-off form:

> While the form includes space for the doctor to explain his
> conclusions, none are provided. There is no accompanying
> report completed by the doctor listing any of his
> observations, medically acceptable clinical testing,
> laboratory diagnostic techniques and explanations for his
> opinion. The only assessments in the doctor's treatment
> records were for the symptoms of back pain without an
> underlying diagnosed medical impairment. With no
> explanations of the doctor's observations and no record of
> any underlying clinical and laboratory testing to support
> the doctor's conclusions, the credibility of this medical
> opinion is particularly suspect inasmuch as it is based on
> incomplete evidence. An opinion such as this, that is based
> primarily on the claimant's description of her symptoms is
> of little probative weight.

Tr. 37. See *Ellars v. Comm'r of Soc. Sec.*, 647 Fed. Appx. 563, 566-67 (6th Cir. 2016)(finding that ALJ did not err in not giving significant weight to treating physician opinion where the opinion consisted of a two-page Physical Capacity Evaluation form, without any explanation or citation to clinical test result, observations, or other objective findings). *Accord, Brady v. Soc. Sec. Admin.*, No. 3:14-CV-1977, 2017 WL 2376864, at *12 (M.D. Tenn. May 31, 2017).

As an initial matter, the Commissioner suggests that Dr. Panovec, who appears to have seen Plaintiff on only one occasion prior to rendering his assessment, does not qualify as a treating physician. Indeed, the United States Court of Appeals for the Sixth Circuit has declined to find that an ongoing treatment relationship exists after only two or three examinations. *See, e.g., Yamin v. Comm'r of Soc. Sec.*, 67 F. App'x 883, 885 (6th Cir. 2003) ("These two examinations did not give [the physician] a long term overview of [the claimant's] condition."); *Boucher v. Apfel*, No. 99-1906, 2000 WL 1769520, at *9 (6th Cir. Nov. 15, 2000) (finding that a doctor did not qualify as a treating source and did not have an ongoing treatment relationship

with the claimant even though the doctor had examined claimant three times over a two-year period). *See also Helm v. Comm'r of Soc. Sec.*, No. 10-5025, 2011 WL 13918, at *3 n.3 (6th Cir. Jan. 4, 2011) (noting that "it is questionable whether a physician who examines a patient only three times over a four-month period is a treating source – as opposed to a nontreating (but examining) source"). However, the ALJ characterized Dr. Panovec as a "treating source," Tr. 37, and this Court will therefore evaluate the ALJ's evaluation of Dr. Panovec's opinions by reference to the standards applicable to treating source statements.

The opinions of treating physicians must be accorded controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and not "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2). If the administrative law judge finds that either of these criteria have not been met, he is then required to apply the following factors in determining the weight to be given a treating physician's opinion: "The length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. ..." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). In this regard, the administrative law judge is required to look at the record as a whole to determine whether substantial evidence is inconsistent with the treating physician's assessment. *See* 20 C.F.R. §§ 404.1527(c)(2),(4);

416.927(c)(2), (4). Finally, the Commissioner must provide "good reasons" for discounting the opinion of a treating source, and those reasons must both enjoy support in the evidence of record and be sufficiently specific to make clear the weight given to the opinion and the reasons for that weight. *Gayheart v. Comm'r of Soc. Sec*, 710 F.3d 365, 376 (6th Cir. 2013); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007)(citing Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5). However, a formulaic recitation of factors is not required. *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) ("If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused.").

In the case presently before the Court, the ALJ found that Dr. Panovec offered no support for his findings and found, further, that those findings were inconsistent with the underlying clinical testing. Tr. 37. Plaintiff disagrees, arguing that Dr. Panovec's opinions are supported by and consistent with those of Horace E. Watson, M.D., a specialist in orthopedics who performed a consultative evaluation of Plaintiff on April 15, 2014. Tr. 793-803. Upon clinical examination,

> Dr. Watson noted the claimant had a normal spinal curvature and a full range of motion of the cervical and thoracic spine. He wrote the claimant has limited motion of the lumbar spine with 30 degrees flexion, 20 degrees extension, and 20 degrees lateral bend to each side. The claimant had a full range of motion of all joints of the four extremities, and was 5/5 in motor function in all four extremities. She had excellent grip strength in both hands. The sciatic stretch test was negative bilaterally. The deep tendon reflexes are 2 plus, and equal in the upper and lower extremities.

Tr. 34. As did Dr. Panovec, Dr. Watson completed a "check-off form" assessment of Plaintiff's residual functional capacity, in which he opined that Plaintiff would be extremely limited in her ability to perform work-related activities. However, the ALJ gave "little weight" to Dr. Watson's assessment, because that assessment was not supported by his own examination or by the objective medical record. *Id.* In light of Dr. Watson's relatively benign findings on his clinical examination of Plaintiff, there is substantial support in the record for that determination.

Plaintiff also contends that Dr. Panovec's assessment is consistent with and supported by an April 22, 2013, MRI, which revealed degenerative changes of the cervical spine, most severe at C5-C6 and C6-C7, and posterior disc protrusion with annular tear at C5-C6 resulting in moderated central canal stenosis with effacement of the lateral recess bilaterally; and mild left neuroforaminal stenosis at L3-L4 and mild central canal stenosis and mild bilateral neuroforaminal stenosis at L4-L5. TR. 684-85. However, as the Commissioner notes, Response (Doc. No. 11, PageID# 908), these findings were "essentially similar" to those seen on an MRI performed in July 2009. Tr. 759. Based on this MRI, Dr. Gray Stahlman, who has treated Plaintiff since 2004, *see* Tr. 758, agreed with Plaintiff's request for treatment by medication only. *Id.* In any event, even Dr. Panovec recommended only extremely conservative treatment, consisting of "gentle exercise, weight loss, and lifestyle modification." Tr. 776.

Plaintiff also contends that the affidavits of a friend and of her mother, Tr. 386-87, support Plaintiff's subjective complaints and Dr. Panovec's assessment, but that the ALJ improperly rejected those statements. Memorandum in Support (Doc. No. 10, PageID# 891-92). With regard to "non-medical sources," the Commissioner's rulings delineate between those who have, and those who have not, seen the claimant "in a professional capacity in connection with their impairments." *See* SSR 06-03P, 2006 WL 2329939, at *5-6 (Aug. 9, 2006). When considering the reports and opinions of a "non-medical source" who has not seen the claimant in a professional capacity, "it would be appropriate [for the ALJ] to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." *Id*. at *5. In either situation, the ALJ has "discretion to determine the proper weight to accord opinions from 'other sources.'" *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997)). Here, the ALJ expressly considered the affidavits, noted the relationship of the affiants to Plaintiff, and concluded that "significant weight cannot be given the witness[es]' evidence because it, like the claimant's, is not consistent with the preponderance of the opinions and observations by medical doctors in the case." Tr. 26. The ALJ did not abuse his discretion in this regard.

The ALJ's conclusion that Dr. Panovec's extremely restrictive assessment is inconsistent with the medical record enjoys substantial support. For example, Dr. Swanson reported essentially normal findings

upon his consultative examination of Plaintiff in March 2011, Tr. 571-73, as did Dr. Patel following her consultative examination of Plaintiff in March 2012. Tr. 633. Dr. Mangrum also reported relatively benign findings in his progress notes following his treatment of Plaintiff in May 2014. Tr. 842-43.

The ALJ expressly accorded "no weight" to Dr. Panovec's assessment. Tr. 38. The ALJ gave good reasons for his evaluation of Dr. Panovec's opinions and that evaluation enjoys substantial support in the record. Even if the record also contains substantial contrary evidence, that fact does not either permit or require reversal of the Commissioner's decision. *See Longworth,* 402 F.3d at 595.

2. Step Three of the Sequential Evaluation

Plaintiff also complains that the ALJ improperly failed to consider whether Plaintiff's back impairments meet or equal Listing 1.04A. Memorandum in Support (Doc. No. 10, PageID# 893). At Step Three of the sequential evaluation of disability, a claimant will be found disabled, regardless of her age, education, or work experience, if she has an impairment that meets or equals one of the Commissioner's listed impairments. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1. The claimant bears the burden of proof at this stage to establish that the criteria of a listing are met or that her impairment is the medical equivalent of a listing. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). In order to establish that an impairment meets a listed impairment, a claimant must establish that her impairment meets all of the specified criteria of the listed impairment. *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990); *Turner v.*

*Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010) (citing 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii)). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan,* 483 U.S. at 530. A claimant must "present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Id.* at 531. (emphasis in original).

Plaintiff specifically invokes Listing 1.04, which addresses disorders of the spine "(e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root." The condition must be accompanied by additional findings, including (as invoked by Plaintiff):

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04A.

The ALJ stated that he considered "the claimant's conditions, [but] conclude[d] they do not satisfy the severity requirements of the listed impairments." Tr. 23. Plaintiff complains that the ALJ improperly failed to expressly consider Listing 1.04A. However, an ALJ is not required to address every listing, nor is he required to "spell out the weight he gave to each factor in his step three analysis. . . ." *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 411 (6th Cir. 2006).

In any event, there is substantial support in the record for the ALJ's implicit conclusion that Plaintiff's impairments do not satisfy Listing 1.04A. Even Dr. Panovec's findings of "strength 5/5 lower

ext[remities,] [deep tendon reflexes] 2+ [symmetrical,] [normal] gait," Tr. 776, undermine Plaintiff's contention in this regard, as do Dr. Swanson's findings of "5/5 [of muscle strength] in all major muscle groups," and deep tendon reflexes of "2+ bilaterally in the upper and lower extremities," Tr. 573, and Dr. Watson's findings of "5/5 in motor function in all four extremities" and "deep tendon reflexes [of] 2 plus and equal in the upper and lower extremities." Tr. 795.

In short, the undersigned concludes that the decision of the Commissioner is supported by substantial evidence and employed in all respects the proper legal standards.

## Recommendation

In light of the foregoing, the undersigned **RECOMMENDS** that the Motion for Judgment (Doc. No. 9) be **DENIED,** that the decision of the Commissioner be **AFFIRMED**, and that final judgment be entered in favor of the Commissioner pursuant to Sentence 4 of 42 U.S.C. § 405(g).

## Procedure on Objections

If any party seeks review by the District Judge of this report and recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the report and recommendation, specifically designating the part thereof in question, as well as the basis for the objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days thereafter. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the report and recommendation will result in a waiver of the right

to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See*, *e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007). Filing only "vague, general, or conclusory objections does not meet the requirement of specific objections and is tantamount to a complete failure to object." *Drew v. Tessmer*, 36 F. App'x 561, 561 (6th Cir. 2002) (citing *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995)).

*s/Norah McCann King*
Norah M<sup>c</sup>Cann King
United States Magistrate Judge

July 12, 2017
 (Date)